## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,**<br><br>                                  **Plaintiff,**<br><br>      **v.**<br><br>**BRUCE GARELICK, MICHAEL SHVARTSMAN, ROCKET ONE CAPITAL LLC, and GERALD SHVARTSMAN,**<br><br>                                  **Defendants.** | **23-CV-5567**<br><br>**ECF Case**<br><br><u>**Complaint**</u><br>**Jury Trial Demanded** |

## <u>COMPLAINT</u>

Plaintiff Securities and Exchange Commission ("Commission"), for its Complaint against Defendants Bruce Garelick, Michael Shvartsman, Rocket One Capital LLC, and Gerald Shvartsman, alleges as follows:

## <u>SUMMARY</u>

1.      This case involves insider trading in the securities of Digital World Acquisition Corporation ("DWAC") by (1) Michael Shvartsman; (2) his brother, Gerald Shvartsman; (3) his employee, Bruce Garelick; and (4) Rocket One Capital LLC ("Rocket One"), a venture capital firm that Michael Shvartsman owned and controlled (collectively, the "Defendants").

2.      DWAC is a special purpose acquisition company ("SPAC") that was formed to raise money from the public for use in the acquisition of another company. In June 2021, Garelick and the Shvartsman brothers signed confidentiality agreements with DWAC and its sponsor that explicitly prohibited the Defendants from trading DWAC securities while in possession of material nonpublic information. Garelick and the Shvartsman brothers were then given material nonpublic information: DWAC planned to pursue a merger with Trump Media & Technology Group Corp. ("TMTG").

3.       Garelick joined the DWAC Board of Directors in July 2021. As a director, Garelick learned updated information in September and October 2021 about DWAC's ongoing merger negotiations with TMTG and voted on actions related to DWAC's pursuit of the merger. DWAC and TMTG announced that they had entered into a merger agreement after markets closed on October 20, 2021.

4.       Garelick had a duty not to trade on the basis of material nonpublic information, and was in possession of material nonpublic information about the status of DWAC's negotiations with TMTG throughout September and October 2021. Nonetheless, in violation of the duty of trust and confidence he owed to DWAC, he repeatedly purchased DWAC securities prior to DWAC's announcement about its merger agreement with TMTG. In addition, Garelick failed to file the forms required to be filed by directors that transact in the securities of the companies for which they serve as a director.

5.       Garelick also shared material nonpublic information about the progress of DWAC's negotiations with TMTG with his employer, Michael Shvartsman, who then purchased DWAC securities on the basis of that information in his Rocket One account prior to DWAC's announcement about its merger agreement with TMTG. Michael Shvartsman's trading breached the duty he owed to DWAC under the confidentiality agreement he signed in June 2021. Michael Shvartsman also knew or was reckless in not knowing that Garelick was a DWAC director who owed a duty of trust and confidence to DWAC and who was breaching this duty by tipping him.

6.       Michael Shvartsman further tipped his brother, Gerald Shvartsman, who also purchased DWAC securities on the basis of the material nonpublic information he received. Gerald Shvartsman's trading breached the duty he owed to DWAC under the confidentiality agreement he signed in June 2021. Gerald Shvartsman also knew that the information his brother provided came from Garelick and that Garelick was a DWAC director. Gerald Shvartsman knew

or was reckless in not knowing that Garelick owed a duty of trust and confidence to DWAC and was breaching this duty by tipping Michael Shvartsman.

7.      On October 21 and 22, 2021, after DWAC and TMTG announced their merger agreement, the Defendants sold their DWAC securities and realized illicit profits of almost $23 million.

8.      As a result of the conduct alleged herein, Defendants violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. In addition, Garelick also violated Exchange Act Section 16(a) [15 U.S.C. § 78p(a)(2)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

9.      The Commission seeks permanent injunctions against Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful conduct set forth in this Complaint, together with prejudgment interest, civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1] against all defendants, a civil penalty pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] against Garelick, an officer and director bar against Garelick and Michael Shvartsman pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)], and such other relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

11.     Venue lies in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa]. Certain of the acts, practices, transactions and courses of business alleged in this Complaint occurred within the Southern District of New York, and were effected, directly or

indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails. For example, several of the Defendants traded through a brokerage firm with offices in New York, several of the Defendants placed their trades through calls to or received from a brokerage firm registered representative that resides in the Southern District of New York, several counterparties to the Defendants' trades are located in the Southern District of New York, and DWAC's securities are listed on the Nasdaq Global Market, which is headquartered in the Southern District of New York.

## BACKGROUND AND COMMONLY-USED TERMS

12.     A special purpose acquisition company, or SPAC, has no underlying business operations. The management team (often referred to as the "sponsor") that forms the SPAC does so in order to raise capital through an initial public offering ("IPO"), for the purpose of using the proceeds to acquire an unidentified private operating company at a later date but within a specified period of time (typically two years).

13.     Generally, in a SPAC IPO, investors purchase units, which are securities that are redeemable for shares of common stock and warrants. Typically, each unit can be redeemed for one share of common stock and a fraction of a warrant. A warrant gives the holder the right to purchase a certain number of shares of the SPAC's common stock at a specific price on a future date.

14.     Each DWAC warrant gives the holder of the warrant the right to purchase one share of DWAC common stock for $11.50. DWAC warrants can only be exercised after the closing of the SPAC's business combination.

15.     Following a SPAC IPO, the unit's component parts can be separated, such that the investor can trade units, shares of common stock, or warrants independently. Each of these securities would be listed separately if trading on U.S. securities exchanges. DWAC units

became eligible for separation on September 30, 2021. At that point in time, DWAC had three separate securities that were listed and traded on the Nasdaq Global Market: DWACU (units), DWACW (warrants) and DWAC (common stock).

16.     After it raises funds through an IPO, a SPAC will seek to identify acquisition candidates and attempt to complete a business combination transaction, after which the company will continue the operations of the acquired company as a public company. Although the post-IPO SPAC is led by a new board of directors and management, these roles are often filled by the leaders of the SPAC's sponsor. Thus, investors in a SPAC at the IPO stage rely on the management team that formed the sponsor to expend efforts after the IPO to identify and acquire or combine with a private operating company.

17.     The SPAC sponsor typically is compensated through its ability to buy the SPAC's securities (typically called "founder's shares") for nominal consideration at or around the time of the SPAC's formation. These securities will then convert into the SPAC's common stock automatically at the time of the SPAC's initial business combination, giving the sponsor a significant stake (typically 20%) in the SPAC, which is dependent upon a sponsor helping the SPAC to complete a business combination. Sponsors also frequently buy additional securities (usually units or warrants) at the time of the IPO. Unlike securities bought by investors in a SPAC IPO, the securities purchased by a sponsor are not redeemable for cash and are subject to forfeit in the event the SPAC fails to complete a business transaction. Moreover, the sponsor's securities usually have restrictions that prevent resale until after completion of a SPAC's business combination.

18.     DWAC's sponsor ("DWAC Sponsor"), is a Delaware corporation based in Miami, Florida. DWAC Sponsor initially invested $25,000 in DWAC in exchange for

8,625,000[1] Class B shares of DWAC stock (the "DWAC founder shares"). At the time of DWAC's IPO, DWAC Sponsor invested an additional $11,334,840 in exchange for 1,133,484 DWAC units.

## DEFENDANTS

19.     Bruce Garelick, age 52, is a resident of Cohasset, MA. Garelick was a DWAC director from July 8, 2021 through June 22, 2022. At all times relevant to this Complaint, he was the chief strategy officer at Rocket One. In response to an SEC subpoena for documents, Garelick asserted his Fifth Amendment right against self-incrimination.

20.     Michael Shvartsman, age 52, is a resident of Sunny Isles Beach, FL and owns and operates numerous business in the financial sector. In response to an SEC subpoena for documents, Michael Shvartsman asserted his Fifth Amendment right against self-incrimination.

21.     Rocket One is a Florida limited liability company with its principal place of business Miami, FL. Rocket One is a venture capital firm. Michael Shvartsman owns and controls Rocket One, and he placed all of Rocket One's trades in DWAC securities.

22.     Gerald Shvartsman, age 45, is a resident of Miami Beach, FL. He owns a furniture store in Miami and is the brother of Michael Shvartsman. In response to an SEC subpoena for documents, Gerald Shvartsman asserted his Fifth Amendment right against self-incrimination.

## RELATED PARTIES AND ENTITIES

23.     DWAC, a Delaware corporation based in Miami, Florida, is a SPAC. DWAC has no operations of its own and exists for the purpose of merging with a privately held company with the effect of taking that company public. On September 8, 2021, DWAC completed an IPO

---

[1]     This quantity of shares reflects a three-for-one stock split effected on July 1, 2021.

of 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million, which are held in trust for the benefit of shareholders until completion of a business combination.

24.     TMTG is a Delaware corporation with its principal place of business in Sarasota, Florida. TMTG operates a social media platform. On October 20, 2021, DWAC and TMTG entered into a definitive merger agreement. TMTG was initially named Trump Media Group, and accordingly, some documents reference "TMG" instead of TMTG.

## FACTS

### A.     DWAC's History with TMTG.

25.     From February 2021 through April 2021, an individual who would later become DWAC's Chairman and CEO ("Individual A") discussed a potential merger between a SPAC that he controlled ("SPAC A") and TMTG with TMTG representatives.

26.     Individual A, age 50, is a resident of Miami, Florida and, at all times relevant to this Complaint, was the CEO and Chairman of DWAC. He owns a significant percentage of, and is the managing member of, DWAC Sponsor. He also was the CEO and Chairman of SPAC A and the managing member of SPAC A's sponsor.

27.     SPAC A, a Delaware corporation with its principal place of business in Miami, Florida, was a SPAC that formerly had securities registered under Section 12(b) of the Exchange Act.

28.     In early April 2021, two directors and one officer of SPAC A opposed pursuing a merger with TMTG. At that point, Individual A began exploring two plans to pursue a merger with TMTG, "Plan A" and "Plan B." "Plan A" referred to continued efforts to find a way for SPAC A to merge with TMTG. "Plan B" referred to Individual A's attempt to identify a different SPAC to pursue a merger with TMTG.

29.     In mid-May 2021, Individual A took over DWAC Sponsor and DWAC and staffed DWAC with directors and officers who were supportive of a deal with TMTG. Individual A planned to use DWAC as the Plan B option to pursue a merger with TMTG. On May 25, 2021, DWAC filed with the SEC an initial securities registration statement regarding its plan to conduct an IPO (the "Form S-1").

30.     On June 4, 2021, SPAC A, TMTG, and Individual A (in both his personal capacity and on behalf of SPAC A) signed a letter expressing intent to pursue a merger between SPAC A and TMTG. This June 4 letter of intent included a clause under which Individual A would be personally liable to pay a $1 million break-up fee if SPAC A and TMTG did not enter an acquisition agreement by August 6, 2021 (the "Break-Up Fee Clause"). The Break-Up Fee Clause had several conditions that would result in Individual A owing no break-up fee. Under one of these conditions, Individual A would owe no break-up fee if he "should propose to [TMTG] an alternative special purpose acquisition corporation with combination terms that are acceptable to [TMTG] (in its sole and absolute discretion) and such terms are ultimately accepted by [TMTG]." The parties signed several extensions to the June 4 letter of intent over the summer of 2021, the last extension of which was signed on or about August 27, 2021. The extensions collectively extended the trigger date for the Break-Up Fee Clause from August 6, 2021 to October 2, 2021.

31.     DWAC's IPO commenced on September 3, 2021 and closed on September 8, 2021. DWAC sold 28,750,000 units at a price of $10.00 per unit, generating gross proceeds of $287.5 million. On September 22, 2021, DWAC's Board (including Garelick) approved the signing of a letter of intent with TMTG that contained mutual exclusivity clauses and included a term sheet outlining a prospective merger between DWAC and TMTG. That same day,

Individual A met with representatives from TMTG and signed a mutually exclusive letter of intent between DWAC and TMTG.

32.     From the commencement of DWAC's IPO until September 30, 2021, the only DWAC securities that traded on the market were DWAC units. Starting on September 30, 2021, however, investors could separate their DWAC units into the underlying DWAC warrants and DWAC shares. From this date forward, all three DWAC securities (units, warrants, and shares) traded on the markets under their own ticker symbol (the one-letter to four-letter code representing the security).

33.     After September 30, the availability of warrants gave investors a relatively cheap way to purchase DWAC securities compared to the shares and units. For example, on October 1, 2021, DWAC warrants traded for approximately 50 cents per warrant, whereas DWAC units and shares trades for approximately $10.15 and $10 respectively.

34.     On October 19, 2021, DWAC's Board approved the signing of a definitive merger agreement with TMTG. DWAC and TMTG signed the definitive merger agreement on October 20, 2021, and it was announced on social media after market close that day. DWAC filed a Form 8-K regarding the deal late on October 20, 2021. The filing was publicly available on EDGAR (the SEC's electronic system for receiving, accepting, and disseminating company filings) at approximately 6 AM on October 21, 2021. DWAC's common stock, which had closed at $9.96 on October 20, 2021, closed at $45.50 on October 21, 2021, up more than 450% from the prior day's closing price. The price of DWAC common stock continued to climb on October 22, reaching a high of $175 per share before closing at $94.20. DWAC warrants and units experienced similar price spikes following the merger announcement.

B.     **Individual A Used Confidentiality Agreements to Raise Funds for DWAC Sponsor in Summer 2021.**

35.     After DWAC filed its Form S-1 in May 2021, Individual A began approaching potential investors and offered them the opportunity to purchase membership interests in DWAC Sponsor, with the understanding that this would entitle the investors to an indirect ownership in the DWAC founder shares owned by DWAC Sponsor. Individual A essentially pitched investors on purchasing the founder shares at a set per share price. For example, Individual A might offer a potential investor the opportunity to invest in DWAC Sponsor at $4 per DWAC founder share, meaning a $100,000 investment in DWAC Sponsor would give the investor an indirect ownership interest in 25,000 DWAC founder shares. These investments were generally at-risk investments, meaning the investors' capital was not redeemable if DWAC ultimately did not complete a business combination. For some investors, however, Individual A offered a redeemable option, whereby an investor could pay more on a per share basis (usually $5 per share) in exchange for the right to redeem their sponsor-level investment at any point prior to the announcement of the signing of a definitive merger agreement with a merger target.

36.     If an investor was interested in learning about the opportunity to invest in DWAC Sponsor, Individual A had that investor sign a confidentiality agreement between the investor, DWAC, and DWAC Sponsor. Individual A would then provide the potential investor with information about DWAC. If the investor was then interested in investing in DWAC Sponsor, the investor would sign a subscription agreement and other documents and wire its investment to one of DWAC Sponsor's bank accounts.

C.     **The Defendants Signed Confidentiality Agreements and Received Material Nonpublic Information.**

37.     In late April 2021, Individual A was introduced to Michael Shvartsman and Gerald Shvartsman and spoke with them about a potential investment in a SPAC. In June,

Individual A resumed discussions with the Shvartsman brothers and was introduced to Garelick. The Shvartsman brothers and Garelick signed confidentiality agreements with DWAC Sponsor and DWAC on June 14, 2021.

38.    Each of those confidentiality agreements stated that the signatories were contemplating an investment in DWAC Sponsor or DWAC (*i.e.*, purchasing founder shares or units in the IPO) related to a possible business combination with a certain target or targets and that the investor would be told the identity of that target or those targets. This agreement defined confidential information as, among other things, any information regarding possible investment or target transactions, as well as all "non-public" information about DWAC. The confidentiality agreements further stated that investors could not disclose the confidential information to anyone, could only use the confidential information for purposes of evaluating the investment transaction being discussed by the parties, and could not otherwise purchase DWAC securities based on the confidential information (*i.e.*, could not trade DWAC securities on the open market). The terms of the confidentiality agreement also explicitly stated that confidential information "may be considered 'material non-public information' for purposes of the federal securities laws."

39.    By signing these confidentiality agreements, the Defendants assumed a duty of trust and confidence, which prohibited the Defendants from trading on material nonpublic information about DWAC.

40.    Garelick was nominated to join the DWAC Board of Directors ("DWAC Board") on July 8, 2021 and became a director at the time of DWAC's IPO, at which point he assumed a traditional fiduciary duty to DWAC. As a director, Garelick was bound by DWAC's Code of Conduct and Ethics, which has a section titled "Insider Trading" and states, in part: "Employees,

Case 1:23-cv-05567   Document 1   Filed 06/29/23   Page 12 of 27

officers and directors must not trade in securities of a company while in possession of material non-public information regarding that company."

**D.      Two Defendants Invested in DWAC Sponsor and Participated in DWAC's IPO.**

41.      Gerald Shvartsman and Michael Shvartsman (through Rocket One) invested in DWAC Sponsor in exchange for indirect ownership interests in DWAC founder shares. The Shvartsman brothers opted for a redeemable investment, whereby they could get their investment back at any point prior to the announcement of the signing of a definitive merger agreement with a merger target. These Defendants collectively invested $275,000 in DWAC Sponsor. Gerald Shvartsman and Michael Shvartsman (through Rocket One) also participated in DWAC's September 2021 IPO, collectively investing more than $250,000 in DWAC units

42.      Garelick did not invest in DWAC Sponsor or DWAC's IPO. Rather, acting in his capacity as Chief Strategy Officer for Rocket One, he helped to find other potential investors for DWAC Sponsor, and became a DWAC director.

**E.      Individual A Told the Defendants About His Plan to Use DWAC to Pursue a Merger with TMTG.**

43.      In summer 2021, prior to the Defendants making investments in DWAC Sponsor (or, in Garelick's case, prior to becoming a DWAC director nominee), Individual A told Garelick and the Shvartsman brothers that Individual A instead planned to use DWAC to pursue a merger with TMTG. Garelick and the Shvartsman brothers learned this information from Individual A on a call that took place on or about June 21, 2021. After that call, Garelick emailed a potential investor, attached a copy of DWAC's Form S-1, and wrote: "I've attached the SPAC prospectus … however, it doesn't say anything about Trump. (can't yet)." The next day, June 22, there was a conference call between Individual A, Garelick, the Shvartsman brothers, and other potential investors (who were added to the call at the request of Garelick and/or Michael Shvartsman).

Garelick followed-up by email to various people on the June 22 call to see if they wanted to invest in the "Trump SPAC."

44.     Around this same time, Garelick learned that he might be named as a DWAC director. For example, on June 24, 2021, Garelick texted his daughter and wrote: "Wild possibility you might get a kick out of … your dad might be named to the 'Trump Media Group's Board of Directors.'" In another message, Garelick characterized his potential seat on the DWAC board of directors as "a front row seat babysitting job" that was "well worth it for an unconventional investment like this."

45.     From the beginning, the Defendants' investment in DWAC was conditional on DWAC merging with TMTG. The Shvartsman brothers made investments in DWAC Sponsor whereby they could redeem their investments at any point prior to the announcement of the signing of a definitive merger agreement with a merger target. And, as Garelick wrote in a June 2021 e-mail, the Defendants intended to exercise these redemption rights if DWAC did not pursue a merger with TMTG.

**F.     Garelick Received Updated Information About DWAC After Its IPO and Purchased DWAC Securities in the Open Market.**

46.     On September 1, 2021, two days before DWAC's IPO commenced, Garelick texted Individual A and wrote: "[I]t's Bruce Garelick at Rocket One. Congrats on the IPO date becoming official!! Let's briefly catch up when you get a minute." Individual A and Garelick spoke for about 6 minutes the next morning. Shortly after that call concluded, Garelick texted Michael Shvartsman and wrote: "I spoke with [Individual A]. Not urgent. We can catch up later." While Garelick did not purchase DWAC units as part of the IPO through DWAC's underwriter, he did purchase DWAC units on September 3, 2021 through an open market transaction done in his personal account at a retail broker dealer. At the time of this purchase,

Garelick was in possession of the material nonpublic information he learned over the summer regarding Individual A's plan to use DWAC to pursue a merger with TMTG.

47.     On September 8, 2021 (the day DWAC's IPO closed), another DWAC investor emailed Garelick and asked about "next steps" for DWAC. Garelick wrote:

> The stock will likely trade within 30c of a $10 handle until they announce a 'target.' The announcement (expected 6-10 weeks from now) is our expected catalyst to then profitably sell the IPO shares. If they don't announce a target we like/expect, we have the right to demand our $10 back – which we will do under this scenario.

Two days after sending the e-mail, Garelick made additional purchases of DWAC units in his retail brokerage account.

48.     At that time, there was no publicly available information indicating that DWAC expected to announce an acquisition target within six to ten weeks. DWAC ultimately announced its merger with TMTG on October 20, 2021, exactly six weeks from Garelick's September 8, 2021 e-mail.

49.     On September 16, 2021, Individual A emailed Garelick, noted that a DWAC Board meeting was scheduled for September 21, and wrote that "we have been hard at work assembling potential targets for the consideration of the board." On September 17 and 20, Garelick made additional purchases of DWAC units in his retail brokerage account.

50.     On September 21, about 35 minutes before the DWAC Board meeting, Garelick again purchased DWAC units in his retail brokerage account. At the DWAC Board meeting that day, which Garelick attended, the DWAC Board discussed several potential targets including TMTG. The DWAC Board also voted to negotiate a letter of intent with TMTG. Individual A sent a message to the DWAC Board later that afternoon and stated that he "planned to start the process of allowing people to disaggregate their units" and that he planned to list DWAC in Mexico. Garelick responded and approved both actions. Less than a half hour after approving

those additional actions, Garelick called Michael Shvartsman and the two spoke for almost 6 minutes.

51.     On September 22, 2021, Individual A met with TMTG and signed an exclusive letter of intent between DWAC and TMTG. Earlier that same day, the DWAC Board approved signing the letter of intent via a WhatsApp thread. Garelick wrote: "I am enthusiastically in favor to advance with TMG under the stated terms." The next morning, September 23, Garelick and Michael Shvartsman spoke on the phone for more than an hour. After that call, DWAC's in-house counsel sent a message to the DWAC Board and wrote: "[W]e will be reporting the results of our successful negotiations very soon. We are just pushing papers now." About an hour after that message was sent, Garelick again purchased DWAC units in his retail brokerage account.

52.     In total, Garelick purchased 5,320 DWAC units between September 3 and September 23. In doing so, Garelick violated both the fiduciary duty he owed as a director to DWAC and its investors and the restrictions on trading in the confidentiality agreement he signed with DWAC and DWAC Sponsor in June 2021, which still applied.

**G.     Garelick Shared Updated Material Non-Public Information with Michael Shvartsman, Who Used His Rocket One Account to Purchase DWAC Warrants.**

53.     Garelick coordinated closely with Michael Shvartsman and advised him on how to trade DWAC securities. For example, on August 30, 2021, four days before DWAC's IPO commenced, Garelick sent a message to Michael Shvartsman and wrote: "Mike - our paperwork for the DWAC IPO is now complete. Do we still want to invest $400k in the $10 IPO shares? Recall we downsized our Founders Class investment from $400k to $125k. Also recall we are playing the IPO shares/warrants as far more of a short term trader."

54.     After DWAC's IPO, Garelick relayed updated inside information about DWAC to Michael Shvartsman and suggested that Michael Shvartsman should purchase more DWAC

15

securities. For example, on September 20, Garelick sent a message to Michael Shvartsman and wrote: "FYI. I have a DWAC BOD meeting tomorrow at 12:30. I recommend starting to buy more DWACU stock" As mentioned in Paragraph 51, *supra*, on September 21, a few hours after the Board meeting concluded, Garelick called Michael Shvartsman and the two spoke for almost 6 minutes.

55.     Similarly, on the morning of September 29, 2021, Individual A sent a message to the DWAC Board (including Garelick) and wrote: "We have a few updates and due diligence is kicking into high gear. TMG wants to close on Oct. 14th. We are getting the team data room access." That same afternoon, Garelick and Michael Shvartsman exchanged three phone calls, with the final call lasting almost 8 minutes. Later that evening, Michael Shvartsman attempted to call Gerald Shvartsman. The two brothers spoke the following morning.

56.     On September 30, 2021, DWAC warrants started trading separately on Nasdaq, meaning investors could get exposure to DWAC securities at a much cheaper price with a far greater potential upside. On that evening after the close of the markets, Garelick spoke with Michael Shvartsman for about 6 minutes. After that call, Garelick sent a message to Michael Shvartsman stating: "Mike - Note, DWACW (warrants) started trading today. . . [a New York resident and registered representative at the brokerage firm where Rocket One held DWAC units ("Registered Representative A")] . . . is your contact to trade." After sending this message, Garelick called the retail brokerage firm[2] where he had his account to start the process of separating his DWAC units. Michael Shvartsman tried to call Garelick while Garelick was speaking with his brokerage firm. Garelick sent Michael Shvartsman a message stating: "Call u back in a little bit. On the line with [brokerage firm] getting them to disaggregate my DWACU."

---

[2] A division of this brokerage firm, which had offices in New York City and Atlanta, Georgia, was the underwriter for DWAC's IPO.

Seconds after Garelick's message, Michael Shvartsman tried to call Gerald Shvartsman. The two brothers eventually spoke for about a minute later that night. Gerald Shvartsman emailed Registered Representative A the next day and asked him to separate his DWAC units.

57.     On October 1, 2021, Michael Shvartsman emailed and spoke with Registered Representative A to place an order to purchase 250,000 DWAC warrants (227,915 of which filled by the end of the trading day). A few minutes after speaking with Registered Representative A, Michael Shvartsman called Gerald Shvartsman and spoke for about two minutes. Michael Shvartsman placed additional orders on October 4 and 5 and in total purchased 2 million DWAC warrants. Michael Shvartsman made these trades because he knew that DWAC had made significant progress in its plan to acquire TMTG and that the merger negotiations were almost complete.

58.     On October 15, 2021 (5 days before DWAC announced the merger), a junior employee at Rocket One emailed himself notes and wrote: "DWAC stock** BUY 10 unit gives you warrant and full share can't lose money. . . . bought 2m warrants b/c target is trump media."

59.     Michael Shvartsman was still bound by the terms of the confidentiality agreement he signed with DWAC and DWAC Sponsor and owed a duty of trust and confidence to DWAC at the time he placed his October trades. Michael Shvartsman also knew that Garelick was a DWAC director and, as such, owed a fiduciary duty to DWAC.

**H.     Michael Shvartsman Tipped Gerald Shvartsman, Who in Turn Purchased DWAC Warrants.**

60.     Michael Shvartsman tipped Gerald Shvartsman, who repeatedly traded after speaking with Michael. Michael Shvartsman and Gerald Shvartsman spoke via telephone numerous times almost every day between September 8 and October 20, 2021. During their conversations, Michael Shvartsman gave Gerald Shvartsman updates that he learned from

17

Garelick, specifically that DWAC had made significant progress in its plan to acquire TMTG and that the announcement of the merger was imminent.

61.     Many of the calls between the Shvartsman brothers occurred on days when Michael Shvartsman had communicated with Garelick. For example, on September 20, 2021, a few hours after Garelick informed Michael Shvartsman that there was a DWAC board meeting the next day, Michael Shvartsman spoke with Gerald Shvartsman for about 2 minutes. They also spoke several times on September 21.

62.     As discussed in Paragraph 57, *supra*, Garelick communicated with Michael Shvartsman several times on September 30, suggested that Michael Shvartsman purchase DWAC warrants, and told Michael Shvartsman that he (Garelick) was separating his DWAC units. Seconds after learning that Garelick was separating his DWAC units, Michael Shvartsman tried to call Gerald Shvartsman. The two brothers eventually spoke for about a minute later that night. Michael Shvartsman bought DWAC warrants the next day, October 1, and spoke with Gerald Shvartsman shortly after placing his order. They also exchanged additional texts and calls that day.

63.     Gerald Shvartsman purchased a total of 400,000 DWAC warrants on October 7, 8, and 18 after communicating with his brother. Prior to placing his first trade, on the evening of October 6, 2021 after the close of the markets, Gerald Shvartsman spoke with Michael Shvartsman for about 4 minutes. Immediately after that call, Gerald Shvartsman emailed Registered Representative A and wrote: "I'd like to buy some warrants in Dspac [sic] can you call me tomorrow." Registered Representative A called Gerald Shvartsman the next morning, and Gerald Shvartsman's placed an order for 275,000 DWAC warrants minutes later. The Shvartsman brothers spoke again on October 8, prior to Gerald Shvartsman purchasing an additional 25,000 DWAC warrants. On October 17, Garelick received a copy of the draft merger

agreement for DWAC and TMTG. That evening, Garelick and Michael Shvartsman spoke for about 31 minutes. The next day, October 18, Gerald and Michael Shvartsman spoke briefly and exchanged several text messages. Then, at about 3:26 pm on October 18, Gerald Shvartsman emailed Registered Representative A and told him to buy an additional 100,000 DWAC warrants.

64.    Gerald Shvartsman was still bound by the terms of the confidentiality agreement he signed with DWAC and DWAC Sponsor and owed a duty of trust and confidence to DWAC at the time he placed his October trades. Gerald Shvartsman also knew, was reckless in not knowing, or consciously avoided knowing, that: (a) Garelick was on the DWAC board and worked at Rocket One Capital; (b) Garelick was the source of the updated information known by Michael Shvartsman; and (c) the information Michael Shvartsman provided him was material nonpublic information.

**I.     Gerald Shvartsman Tipped his Employee, Who in Turn Tipped his Father.**

65.    Prior to DWAC's announcement of the merger with TMTG, Gerald Shvartsman told at least one of his employees that DWAC planned to announce a merger with TMTG within two weeks and that they should buy DWAC warrants.

66.    Late in the afternoon on Friday October 15, Gerald Shvartsman spoke to one of his employees by telephone for about 9 minutes. Whether in this conversation, or in some other conversation between October 15 and October 19, Gerald Shvartsman informed his employee that DWAC planned to announce a merger with TMTG within two weeks and told that employee to buy DWAC warrants.

67.    After the close of the markets on Monday, October 18 and after his order for DWAC warrants had been filled that day, Gerald Shvartsman tried to call the employee and left a short voicemail. On October 19, the employee placed a trade to purchase 100,000 DWAC

warrants. Shortly after placing the order, the employee texted Gerald Shvartsman and wrote: "Loaded 100k" of "Ticker DWACW." Gerald Shvartsman responded with a thumbs up emoji and wrote: "I'm in for 500k", and "My brother 2m." At the time, Gerald Shvartsman had invested about $445,000 in DWAC (sponsor shares, IPO purchases, and warrant purchases); and Michael Shvartsman (through his Rocket One account) purchased 2 million DWAC warrants on the open market.

68.     After learning this information from Gerald Shvartsman, the employee tipped his father, who then purchased 40,000 DWAC warrants.

69.     After the public announcement of the DWAC merger with TMTG, Gerald Shvartsman's employee sold his position on October 21 and realized net profits of $455,500. The employee sent a message to Gerald Shvartsman on evening of October 21 and wrote: "I'm out, sold all ... Thank you again!" Gerald Shvartsman replied: "I'm happy for you. I'll be waiting for my commission." The employee's father sold his position on October 22 and realized net profits of $1,580,000.

**J.    The Defendants Sold their Positions After DWAC Announced the Merger Agreement with TMTG.**

70.     DWAC and TMTG signed the definitive merger agreement on October 20, 2021. The agreement was announced on social media after market close that day. DWAC's common stock closed at $9.96 on October 20, 2021 and closed at $45.50 on October 21, 2021, up more than 450% from the prior day's closing price. The price of DWAC common stock continued to climb on October 22, reaching a high of $175 per share before closing at $94.20. DWAC warrants and units experience similar price spikes following the merger announcement.

71.     Following the merger announcement, the Defendants liquidated the units they purchased during DWAC's IPO and the DWAC units and/or warrants they had purchased on the open market holdings. Specifically:

    a.   Garelick sold his entire position on 10/21 and realized net profits of $49,701.95 from his open market trades.

    b.   Michael Shvartsman (through Rocket One) sold his entire position on 10/21 and 10/22 and realized net profits of $18,269,042.98 from his open market trades.

    c.   Gerald Shvartsman sold his entire position on 10/21 and 10/22 and realized net profits of $4,640,325.25 from his open market trades.

**L.    Garelick Received a Benefit from Rocket One's Trades and Understood that, as a Director, He Could Not Trade DWAC Securities.**

72.     On October 21, 2021, after the markets closed, Garelick texted someone who appears to be his girlfriend and wrote: "Big day today – my Trump SPAC traded up 400% today! We made $20 mil on it."

73.     Earlier that day, in a chat thread, an unrelated individual asked Garelick if he "made out like a bandit?" Garelick responded:

> I did ok. But unfortunately had to restrict myself a month ago due to my involvement on the Board of Directors of the SPAC. So was very limited in what I could buy. . . . Wish I wasn't on the BOD. Severely restricted what I could do.

The unrelated individual then wrote: "Oh so rocket is very involved. I assume. That's standard to restrict board members like that?" Garelick answered: "Yep! Took one for the team."

74.     In addition, Garelick benefited professionally from passing along material nonpublic information to his employer, who made millions of dollars off of Garelick's information.

**M.**     **Garelick Did Not File Forms 4 or 5 Related to His DWAC Trades.**

75.     Exchange Act Section 16(a) [15 U.S.C. § 78p(a)] and the rules thereunder require certain individuals (officers, directors, and persons that beneficially own more than 10% of any class of an Exchange Act registrant's equity securities) to report transactions in and holdings of their company's securities by filing Forms 3, 4, and 5. Among other requirements, a party must file: (1) a Form 4 before the end of the second business day following the execution of a transaction involving a change in beneficial ownership, subject to certain exemptions; and (2) a Form 5, within 45 days after the issuer's fiscal year end, to report all transactions and holdings that should have been reported during the issuer's most recent fiscal year but were not, as well as certain transactions not required to be reported on Form 4. The filings provide the markets and the Commission with important disclosures about insider transactions.

76.     Garelick purchased 5,320 DWAC units between September 3 and September 23, separated those units, and sold his entire position on October 21. Garelick did not file a Form 4 for any of these transactions. He also did not file a Form 5 to report any transactions and holdings that should have been reported but were not.

**FIRST CLAIM FOR RELIEF**
**Violations of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Thereunder (All Defendants)**

77.     The Commission realleges and incorporates by reference paragraphs 1 through 77, as though fully set forth herein.

78.     The Defendants had a duty to keep material nonpublic information regarding the the potential DWAC and TMTG merger confidential. Garelick and the Shvartsman brothers signed confidentiality agreements with DWAC in the summer of 2021 and assumed a duty to keep material nonpublic information confidential and to not trade on the basis of that

information. As a DWAC director, Garelick also owed a fiduciary duty to DWAC and its shareholders.

79.     Garelick and the Shvartsman brothers learned about the possibility of a DWAC merger with TMTG, which was material nonpublic information, after signing those confidentialy agreements. They had a duty to not trade DWAC securities on the open market on the basis of that information. Michael Shvartsman's knowledge and duty can be imputed to Rocket One, as he was the sole owner of Rocket One, controlled the entity, and placed the trades in Rocket One's account.

80.     As a DWAC director, Garelick learned additional information about the DWAC merger negotiations with TMTG after DWAC's IPO and shared that information with Michael Shvartsman, who in turn shared that information with Gerald Shvartsman. Gerald Shvartsman then tipped at least one of his employees and recommended that the employee purchase DWAC warrants.

81.     Garelick and the Shvartsman brothers knew, were reckless in not knowing, or consciously avoided knowing that they owed a fiduciary duty or similar duty of trust and confidence to DWAC and/or its shareholders to keep the information confidential and refrain from trading or tipping the information to others. Michael Shvartsman's mental state can be imputed to Rocket One, as he was the sole owner of Rocket One, controlled the entity, and placed the trades in Rocket One's account.

82.     In breach of their duties, Garelick, Gerald Shvartsman, and Michael Shvartsman (through Rocket One) traded and/or tipped others to trade on the basis of material nonpublic information despite knowing, being reckless in not knowing, or consciously avoiding knowing, that the information was material and nonpublic. The Defendants knew, were reckless in not knowing, or consciously avoided knowing that the material nonpublic information was disclosed

or misappropriated in breach of a fiduciary duty or obligation arising from a similar relationship of trust or confidence. Michael Shvartsman's mental state can be imputed to Rocket One, as he was the sole owner of Rocket One, controlled the entity, and placed the trades in Rocket One's account.

83.     Garelick, Gerald Shvartsman, and Michael Shvartsman intended for their tippees to trade or knew, were reckless in not knowing, or consciously avoided knowing that their tippees would trade on their tips. Garelick, Gerald Shvartsman, and Michael Shvartsman personally benefited from their tips of material nonpublic information, including the benefit of providing gifts of information to close relatives or friends.

84.     By engaging in the conduct described above, the Defendants, directly or indirectly, in connection with the purchase or sale of securities, by the use of means or instrumentalities of interstate commerce, or of the mails, with scienter: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

85.     By reason of the conduct described above, Defendants, directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rules 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**SECOND CLAIM FOR RELIEF**
**Violations of Section 16(a) of the Exchange Act**
**and Rule 16a-3 Thereunder (Garelick)**

86.     The Commission realleges and incorporates by reference paragraphs 1 through 77, as though fully set forth herein.

87.    From from July 8, 2021 through June 22, 2022, Garelick, while serving as a DWAC director, traded DWAC securities and failed to file with the Commision: (1) Form 4, before the end of the second business day following the execution of a transaction involving a change in beneficial ownership; and/or (2) Form 5, within 45 days after the issuer's fiscal year end (as relevant here, December 31, 2021), to report all transactions and holdings that should have been reported during the issuer's most recent fiscal year but were not.

88.    By reason of the conduct described above, Garelick directly or indirectly, violated and, unless enjoined will again violate, Exchange Act Section 16(a) [15 U.S.C. § 78p(a)(2)] and Rules 16a-3 thereunder [17 C.F.R. § 240.16a-3].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court grant the following relief:

### I.

Enter a Final Judgment permanently restraining and enjoining Defendants and their agents, servants, employees and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Enter a Final Judgment permanently restraining and enjoining Garelick and his agents, servants, employees and attorneys, and those persons in active concert or participation with him who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 16(a) of the Exchange Act [15 U.S.C. § 78p(a)(2)] and Rule 16a-3 thereunder [17 C.F.R. § 240.16a-3].

**III.**

Enter a Final Judgment directing Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains obtained by reason of the unlawful conduct alleged in this Complaint pursuant to Sections 21(d)(3), 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. § 78u(d)(3), (d)(5), and (d)(7)].

**IV.**

Enter a Final Judgment directing Garelick to pay a civil monetary penalty pursuant to Sections 21(d)(3) and 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3) & 78u-1];

**V.**

Enter a Final Judgment directing Gerald Shvartsman, Michael Shvartsman, and Rocket One to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1];

**VI.**

Enter a Final Judgment permanently barring Garelick and Michael Shvartsman from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] and that is required to file reports under Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)] pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and

**VII.**

Grant such other and further relief as this Court may deem just and appropriate for the protection of investors pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## **JURY DEMAND**

The Commission demands a jury in this matter for all claims so triable.


Dated: June 29, 2023                                     Respectfully submitted,

                                                         By: __/s/ *John B. Timmer*_____
                                                         John B. Timmer*
                                                         Andrew McFall*
                                                         Securities and Exchange Commission
                                                         100 F Street, N.E.
                                                         Washington, DC 20549
                                                         (202) 551-7687 (Timmer)
                                                         Email: TimmerJ@SEC.gov

                                                         *Attorneys for the Plaintiff*


*\*Pending admission pro hac vice*

Of Counsel

Lindsay S. Moilanen